Approved: _____
PAUL MONTELEONI/ALINE FLODR/THOMAS McKAY
Assistant United States Attorneys

Before:  HONORABLE KATHARINE H. PARKER
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - x
                            :    **20 MAG 12754**
                            :
UNITED STATES OF AMERICA    :    <u>**SEALED COMPLAINT**</u>
                            :
        - v. -              :    Violations of
                            :    18 U.S.C. § 666 and 2
THOMAS CAPUTO,              :
JOSEPH RUZZO,               :    COUNTIES OF OFFENSE:
JOHN NUGENT, and            :    NEW YORK
JOSEPH BALESTRA,            :
                            :
        Defendants.         :
                            :
- - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MATTHEW BRIGHAM, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

<u>**COUNT ONE**</u>
**(Federal Program Fraud)**

        1.   From at least in or about 2017, up to and including in
or about May 2019, in the Southern District of New York and
elsewhere, THOMAS CAPUTO, JOSEPH RUZZO, JOHN NUGENT, and JOSEPH
BALESTRA, the defendants, being agents of an organization, State
and local government and an agency thereof, to wit, employees of
the Long Island Rail Road ("LIRR"), a subsidiary of the
Metropolitan Transportation Authority ("MTA"), knowingly did
embezzle, steal, obtain by fraud, and otherwise without authority
knowingly did convert to the use of a person other than the
rightful owner, property that is valued at $5,000 and more and is
owned by and is under the care, custody, and control of such
organization, government, and agency, while such government and
agency was in receipt of, in any one year period, benefits in
excess of $10,000 under a Federal program involving a grant,
contract, subsidy, loan, guarantee, insurance, and other form of

federal assistance, to wit, CAPUTO, RUZZO, NUGENT, and BALESTRA submitted false records, which fraudulently overstated the number of hours that they had worked, and thereby each received over $5,000 in payments for hours that they did not in fact work.

   (Title 18, United States Code, Sections 666(a)(1)(A) and 2.)

        The bases for my knowledge and for the foregoing charges are, in part, as follows:

    2.    I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter, which has been jointly investigated with the MTA Office of the Inspector General ("MTA-OIG"). This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of reports, records, and other documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

    3.    These charges arise from a scheme carried out by THOMAS CAPUTO, JOSEPH RUZZO, JOHN NUGENT, and JOSEPH BALESTRA, the defendants, and others known and unknown, whereby CAPUTO, RUZZO, NUGENT, and BALESTRA each fraudulently received thousands of dollars in compensation from the MTA by falsely claiming to have worked voluntary overtime hours that in fact they did not work. The overtime pay the defendants claimed led to significant increases in their salary and led to them being among the highest paid employees of the MTA, and in the case of CAPUTO, the highest-paid employee of the MTA. As detailed herein, the defendants frequently volunteered for overtime shifts and then claimed to have been working overtime at times when they were in fact at home or at other non-work locations, such as, in the case of CAPUTO, a bowling alley. In addition, on several occasions CAPUTO also falsely claimed to have worked regular time hours that he did not work.

    4.    During the course of this scheme, THOMAS CAPUTO, JOSEPH RUZZO, JOHN NUGENT, and JOSEPH BALESTRA, the defendants, each were paid for at least several hundred hours that they did not in

fact work, resulting in thousands of dollars each in unwarranted and fraudulently obtained compensation.

### The Defendants' Employment with the LIRR

5.    The MTA is a public benefit corporation responsible for public transportation in New York State.  The MTA runs North America's largest transportation network, providing bus, subway and rail service to a population of more than 15 million people in New York City and the surrounding areas.  The MTA's operating agencies include the LIRR (also known as MTA Long Island Rail Road), a commuter railroad providing service between Manhattan and locations on Long Island.

6.    Based on publicly available sources, as well as my conversations with representatives of the MTA-OIG, I know that in each year relevant to this complaint, the MTA and the LIRR each received funds from the federal government in excess of $10,000.

7.    Based on my review of MTA records and conversations with MTA-OIG auditors, I know the following:

a.    THOMAS CAPUTO, the defendant, was an employee of the LIRR until he retired on or about April 1, 2019.  During the relevant years prior to his retirement, CAPUTO was a Chief Measurement Officer, which required him to, among other things, oversee and operate the movement of the "geometry car," an automated track inspection vehicle.

b.    JOSEPH RUZZO, the defendant, was an employee of the LIRR until he retired on or about October 1, 2019.  JOHN NUGENT and JOSEPH BALESTRA, the defendants, are employees of the LIRR.  In 2018 and 2019, RUZZO was a track foreman.  For approximately the first half of 2018, NUGENT and BALESTRA were surfacing foremen, and then both became track foremen in July 2018 and remained in those positions through 2019.  RUZZO, NUGENT, and BALESTRA were each required to, among other things, perform track maintenance along the right-of-way.

c.    In addition to their regular duties, CAPUTO, RUZZO, NUGENT, and BALESTRA each volunteered to work and were assigned a number of lucrative overtime shifts during which they were required to, among other things, support third-party contractors working on construction projects on or around LIRR properties.  These voluntary overtime shifts were offered to LIRR employees in order of their seniority under the applicable union collective bargaining agreements.  Accordingly, CAPUTO, RUZZO,

NUGENT, and BALESTRA had priority in selecting voluntary overtime shifts over their respective less-senior colleagues, enabling them to be assigned large quantities of voluntary overtime shifts.

d.    At all relevant times, CAPUTO, RUZZO, NUGENT, and BALESTRA received hourly rates for their regular 40-hour weekly schedule, and were then entitled to be paid higher "overtime" rates -- typically one and a half or two times the regular hourly rate, depending on the circumstances -- for any additional hours worked.

e.    At all relevant times, CAPUTO, RUZZO, NUGENT and BALESTRA were required to self-report their time, including any overtime hours, on LIRR records called "labor sheets."

## The Defendants' Excessive Overtime Claims

8.    Based on my review of MTA records and conversations with MTA-OIG auditors, I have learned the following with respect to the overtime claims of THOMAS CAPUTO, the defendant:

a.    In 2018, CAPUTO was paid approximately $461,000 by the MTA.  Of that amount, approximately $117,000 comprised his base salary and other forms of compensation apart from overtime, while the additional approximately $344,000 was paid for overtime that CAPUTO ostensibly worked.  In total, this made CAPUTO the highest paid employee at the MTA during 2018 -- higher than, for example, the Chairman of the MTA.

b.    In 2018, CAPUTO claimed to have worked approximately 3,864 overtime hours, on top of 1,682 regular hours.  That is, if CAPUTO had worked every single calendar day in 2018 including weekends and holidays (although he did not), that would average out to approximately 10 hours of overtime *every day* for an entire year in addition to his regular, 40-hour work week.

c.    As noted, CAPUTO retired on April 1, 2019. CAPUTO's retirement came days after his 55th birthday, the earliest date upon which he became eligible for a full pension. Pension amounts for LIRR employees such as CAPUTO are calculated with reference to the employee's total pay during the three highest-paid years out of the ten years preceding retirement. Accordingly, the amount of CAPUTO's pension was increased as a result of the large amount of CAPUTO's claimed overtime pay in the preceding years.

9.    Based on my conversations with MTA-OIG auditors and my review of MTA records, I have learned that JOSEPH RUZZO, JOHN NUGENT, and JOSEPH BALESTRA, the defendants, similarly claimed to have worked and were paid for an excessive amount of overtime hours in 2018.   In particular, the equivalent statistics, all of which are approximate, to those described above for THOMAS CAPUTO, the defendant, are reported in the following chart:

| Defendant | 2018 Total Income from MTA (salary and overtime) | 2018 Overtime ("OT") Payments from MTA | 2018 Income Rank Among All MTA Employees | 2018 OT Hours Claimed | 2018 Average Claimed Daily OT Hours[1] |
|-----------|------|------|------|------|------|
| CAPUTO | 461,000 | 344,000 | 1 | 3,864 | 10 |
| RUZZO | 380,000 | 267,000 | 4 | 3,365 | 9 |
| NUGENT | 350,000 | 242,000 | 11 | 2,918 | 8 |
| BALESTRA | 348,000 | 241,000 | 12 | 2,954 | 8 |

## The Defendants' Frequent Absences from Work

10.    Based on my conversations with MTA-OIG auditors and my review of MTA records, I know that MTA-OIG auditors have worked with criminal investigators to perform a detailed review of the hours claimed to have been worked by THOMAS CAPUTO, JOSEPH RUZZO, JOHN NUGENT, and JOSEPH BALESTRA, the defendants, for in or around calendar year 2018.   This investigation entailed, *inter alia*, comparing the time records for the defendants with various records that establish their true whereabouts, such as location information for their cellular phones, bank records, and records from third parties such as a bowling alley where CAPUTO participated in bowling league games despite claiming to work an average of 10 hours of overtime every single day of 2018.

11.    In sum, the MTA-OIG's investigation reflects that CAPUTO, RUZZO, NUGENT, and BALESTRA were each absent from work for hundreds of hours, which they falsely claimed on labor sheets submitted to the MTA that they had been present and working.   As a result, each received thousands of dollars in unjustified and

---

[1] This average daily overtime hours figure, as in paragraph 8.b, above, reflects the total annual number of overtime hours divided by 365, rounded down.

fraudulently obtained compensation.[2]  The following examples
provide a limited sample of the many absences established through
the investigation for each of the defendants.

<u>Examples of CAPUTO's Absences</u>

12.  Based on my review of information gathered during the
MTA-OIG investigation, including labor sheets submitted by THOMAS
CAPUTO, the defendant, historical cell site location and other
records for his cellular phone, bank records, and records of his
participation in bowling league games, among other records, I
have learned the following:

*October 11, 2018*

a.  According to MTA records, CAPUTO claimed to work,
and was paid for, a regular shift beginning at 7:30 a.m. on
October 11, 2018 and ending at 3:30 p.m.  CAPUTO then claimed to
work, and was paid for, an overtime shift at the West Side Yard
in Manhattan -- the site of a construction project in the
vicinity of West 34th Street near the Hudson River -- beginning
at 4:00 p.m. on October 11, 2018 and continuing until 7:00 a.m.
on October 12.  In fact, however, I believe that CAPUTO did not
work the entirety of this overtime shift as he claimed, because,
among other reasons:

i.  CAPUTO's phone records reflect that between
4:09 p.m. and 6:24 p.m., CAPUTO engaged in eight phone calls from
the vicinity of Lake Ronkonkoma and Holtsville, New York.  Seven
of these calls used CAPUTO's personal phone, and one of them used
his work phone.  CAPUTO resides near Holtsville and Lake
Ronkonkoma, New York, which are locations in Suffolk County that
are near each other and over 50 miles away from the West Side
Yard by car.

---

[2] The estimates herein of fraudulently claimed hours and
unjustified compensation are approximate and conservative
figures, as they include highly conservative estimates about the
amount of time the defendants were absent from work and account
for the possibility that, in certain limited circumstances such
as travel to or from the job site or cancellation of the job, an
employee may justly be paid for hours he was not physically
present.  In light of the implausibly high amount of overtime
claimed by the defendants and the pattern of fraudulent conduct
detailed herein, the true totals are likely substantially higher.

     ii.     Records maintained by a bowling alley (the "Bowling Alley") reflect that CAPUTO participated in a bowling league game on October 11, 2018, beginning at 7:30 p.m. (*i.e.*, during his overtime shift).  The records reflect that CAPUTO bowled three games that evening, averaging a score of 196.  An employee of the Bowling Alley informed me that such league events typically end at approximately 10:00 p.m.  The Bowling Alley is located in Patchogue, a village in Suffolk County, and is over 55 miles away from the West Side Yard by car.

     iii.     Notwithstanding the above, subsequent to these shifts CAPUTO submitted a labor sheet to the MTA falsely self-reporting that he had worked the full overtime shift, from 4 p.m. on October 11 until 7 a.m. on October 12. As a result, for that shift alone, CAPUTO was paid approximately $1,217.

*February 16-17, 2019*

     b.     According to MTA records, CAPUTO claimed to work, and was paid for, an overtime overnight shift from 9:00 p.m. on February 16, 2019 to 5:00 a.m. on February 17 at the Harold Interlocking, a rail junction in Queens, New York that was the site of a construction project.  He also claimed to work, and was paid for, a second overtime shift, from 7:30 a.m. to 9:00 p.m. on February 17, at another location in Queens, New York.  In fact, however, I believe that CAPUTO did not work the entirety of either shift as he claimed, because, among other reasons:

     i.     CAPUTO's phone records reflect that CAPUTO engaged in a phone call using his personal phone, from the vicinity of Lake Ronkonkoma, at approximately 11:51 p.m. on February 16, 2019 (*i.e.*, during his first claimed overtime shift).  The location from which CAPUTO engaged in this phone call was over 50 miles away from the job site for his first overtime shift by car.

     ii.     CAPUTO's bank records reflect that at approximately 9:15 a.m. on February 17, 2019 (*i.e.*, during his second claimed overtime shift), CAPUTO engaged in a financial transaction at an ATM in the vicinity of a location in Lake Ronkonkoma, New York, over 40 miles away from the job site for his second overtime shift by car.

     iii.     CAPUTO's phone records reflect that CAPUTO engaged in four phone calls using his personal phone between 9:35 a.m. and 5:40 p.m. on February 17, 2019 (*i.e.*, during his second overtime shift), from the vicinity of Lake Ronkonkoma, New York.

iv.     Notwithstanding the above, subsequent to these shifts CAPUTO submitted labor sheets to the MTA falsely self-reporting that he had worked both full overtime shifts, from 9 p.m. on February 16 until 5 a.m. on February 17 and then from 7:30 a.m. to 9 p.m. on February 17.  As a result, for those shifts alone, CAPUTO was paid approximately $2,326.

*March 7-8, 2019*

c.     According to MTA records, CAPUTO claimed to work, and was paid for, an overnight shift from 4:30 p.m. on March 7, 2019 to 2:00 a.m. on March 8 at the Harold Interlocking in Queens, New York.  In fact, however, I believe that CAPUTO did not work the entirety of this shift as he claimed, because:

i.     CAPUTO's phone records reflect that CAPUTO engaged in a call using his personal phone at 7:05 p.m. (*i.e.*, during his shift), from the vicinity of a location in Patchogue, New York, near the Bowling Alley and over 50 miles from his job site by car.

ii.     Records from the Bowling Alley reflect that CAPUTO participated in a bowling league game on March 7, 2019, beginning at 7:30 p.m. (*i.e.*, several minutes after the phone call described above).  The records reflect that CAPUTO bowled 3 games, averaging a score of 205.

iii.     CAPUTO's bank records reflect that CAPUTO engaged in a credit card transaction at the Bowling Alley on March 7, 2019 at approximately 9:20 p.m. (*i.e.*, during his shift).

iv.     CAPUTO's phone records reflect that CAPUTO engaged in a call using his personal phone at 10:30 p.m. (*i.e.*, during his shift) from the vicinity of a location in Patchogue, New York, near the Bowling Alley and over 50 miles from his job site by car.

v.     Notwithstanding the above, subsequent to this shift CAPUTO submitted a labor sheet to the MTA falsely self-reporting that he had worked the full overtime shift, from 4:30 p.m. on March 7 until 2 a.m. on March 8.  As a result, for that shift alone, CAPUTO was paid approximately $770.

<u>Examples of RUZZO's Absences</u>

13.   Based on my review of information gathered during the MTA-OIG investigation, including labor sheets submitted by JOSEPH RUZZO, the defendant, cell site location and other records for his cellular phone, among other records, I have learned the following:

*February 4, 2018*

a.   According to MTA records, RUZZO claimed to have worked, and was paid for, a 10:30 a.m. to 6:30 p.m. shift on February 4, 2018, at the West Side Yard in Manhattan.  In fact, however, I believe that RUZZO did not work the entirety of this shift as he claimed, because, among other reasons:

i.   RUZZO's phone records reflect that RUZZO engaged in seven phone calls, from 1:08 p.m. to 3:54 p.m. on February 4, 2018 (*i.e.*, during his shift), from locations in the vicinity of Levittown, New York.  RUZZO resides in Levittown, which is a hamlet in Nassau County and which is over 30 miles by car from RUZZO's job site.

ii.   Notwithstanding the above, subsequent to this shift RUZZO submitted a labor sheet to the MTA falsely self-reporting that he had worked the full overtime shift, from 10:30 a.m. until 6:30 p.m. on February 4. As a result, for that shift alone, RUZZO was paid approximately $786.

*April 23-24, 2018*

b.   According to MTA records, RUZZO claimed to have worked, and was paid for, an overnight shift from 5:00 p.m. on April 23, 2018 to 5:00 a.m. on April 24 at the West Side Yard in Manhattan.  In fact, however, I believe that RUZZO did not work the entirety of this shift as he claimed, because among other reasons:

i.   RUZZO's phone records reflect that RUZZO engaged in six phone calls, from 5:00 p.m. on April 23 to 12:23 a.m. on April 24 (*i.e.*, during his shift), all of which were made or received from the vicinity of Levittown, or more than 30 miles away from the West Side Yard where RUZZO was ostensibly working an overtime shift.

ii.   Notwithstanding the above, subsequent to this shift RUZZO submitted a labor sheet to the MTA falsely self-

reporting that he had worked the full overtime shift, from 5 p.m. on April 23 until 5 a.m. on April 24. As a result, for that shift alone, RUZZO was paid approximately $885.

*July 1, 2018*

c.     According to MTA records, RUZZO claimed to have worked, and was paid for, a 4:00 a.m. to 7:30 p.m. shift on July 1, 2018 at the Harold Interlocking job site in Queens, New York. In fact, however, I believe that RUZZO did not work the entirety of this shift as he claimed, because among other reasons:

i.     RUZZO's phone records reflect that RUZZO engaged in 12 phone calls, from 8:00 a.m. to 2:23 p.m. on July 1, 2018 (*i.e.*, during his shift), all from the vicinity of Levittown, New York, which is over 25 miles away from the Harold Interlocking job site.

ii.     Notwithstanding the above, subsequent to this shift RUZZO submitted a labor sheet to the MTA falsely self-reporting that he had worked the full overtime shift, from 4 a.m. until 7:30 p.m. on July 1. As a result, for that shift alone, RUZZO was paid approximately $1,426.

<u>Examples of NUGENT's Absences</u>

14.     Based on my review of information gathered during the MTA-OIG investigation, including labor sheets submitted by JOHN NUGENT, the defendant, cell site location and other records for his cellular phone, among other records, I have learned the following:

*February 20-21, 2018*

a.     According to MTA records, NUGENT claimed to have worked, and was paid for, a shift from 4:00 p.m. on February 20, 2018 to 4:00 a.m. on February 21, 2018, at the West Side Yard in Manhattan. In fact, however, I believe that NUGENT did not work the entirety of this shift as he claimed, because among other reasons:

i.     NUGENT's phone records reflect that NUGENT engaged in approximately 22 phone calls, text messages, and data transmissions from approximately 7:49 p.m. until approximately 9:28 p.m. (*i.e.*, during NUGENT's shift), from the vicinity of a number of points in Nassau and Suffolk counties, including Rocky Point, New York. NUGENT resides in the vicinity of Rocky Point, a

hamlet in Suffolk County that is over 69 miles by car from NUGENT's job site.

   ii. Notwithstanding the above, subsequent to this shift NUGENT submitted a labor sheet to the MTA falsely self-reporting that he had worked the full shift, from 4:00 p.m. on February 20 to 4:00 a.m. on February 21. As a result, for that shift alone, NUGENT was paid approximately $1,017.

*April 19-20, 2018*

  b. According to MTA records, NUGENT claimed to have worked, and was paid for, an overnight shift from 4:00 p.m. on April 19, 2018 to 6:00 a.m. on April 20 at the West Side Yard in Manhattan. In fact, however, I believe that NUGENT did not work the entirety of this shift as he claimed, because, among other reasons:

   i. NUGENT's phone records reflect that NUGENT engaged in approximately 28 phone calls, text messages, and data transmissions throughout the course of his shift from the vicinity of Noyack, Bridgehampton, Southampton, Flanders, East Shoreham, Port Jefferson, and Rocky Point, New York -- all locations in Suffolk County at least 60 miles by car from NUGENT's job site.

   ii. Notwithstanding the above, subsequent to this shift NUGENT submitted a labor sheet to the MTA falsely self-reporting that he had worked the full shift, from 4:00 p.m. on April 19 to 6:00 a.m. on April 20. As a result, for that shift alone, NUGENT was paid approximately $1,424.

*September 19-20, 2018*

  c. According to MTA records, NUGENT claimed to have worked, and was paid for, an overnight shift from 4:00 p.m. on September 19, 2018 to 6:00 a.m. on September 20 at the West Side Yard in Manhattan. In fact, however, I believe that NUGENT did not work the entirety of this shift as he claimed, because, among other reasons:

   i. NUGENT's phone records reflect that NUGENT engaged in approximately 28 phone calls, text messages, and data transmissions from approximately 11:05 p.m. on September 19, 2018 to approximately 4:10 a.m. on September 20 (*i.e.*, during NUGENT's shift), from the vicinity of Rocky Point. As noted above, Rocky

11

Point is over 69 miles away from the West Side Yard job site by car.

        ii.    Notwithstanding the above, subsequent to this shift NUGENT submitted a labor sheet to the MTA falsely self-reporting that he had worked the full shift, from 4:00 p.m. on September 19 to 6:00 a.m. on September 20.  As a result, for that shift alone, NUGENT was paid approximately $1,180.

<u>Examples of BALESTRA's Absences</u>

    15.  Based on my review of information gathered during the MTA-OIG investigation, including labor sheets submitted by JOSEPH BALESTRA, the defendant, cell site location and other records for his cellular phone, among other records, I have learned the following:

*January 3-4, 2018*

        a.    According to MTA records, BALESTRA claimed to have worked, and was paid for, an overnight shift from 4:00 p.m. on January 3, 2018 to 7:00 a.m. on January 4 at the West Side Yard in Manhattan.  In fact, however, I believe that BALESTRA did not work the entirety of this shift as he claimed, because, among other reasons:

        i.    BALESTRA's phone records reflect approximately 9 phone calls that originated from the vicinity of Blue Point and Ronkonkoma, New York, starting at approximately 5:01 p.m. and going as late as 7:06 p.m., 3 hours into BALESTRA's overnight shift.  BALESTRA resides in Blue Point, New York, a hamlet in Suffolk County, New York, which is near Ronkonkoma and approximately 60 miles from BALESTRA's assigned work location by car.

        ii.    Notwithstanding the above, subsequent to the shift BALESTRA submitted a labor sheet to the MTA, falsely self-reporting that he had worked the full shift, from 4:00 p.m. on January 3 to 7:00 a.m. on January 4.  As a result, for that shift alone, BALESTRA was paid approximately $1,290.

*June 26-27, 2018*

        b.    According to MTA records, BALESTRA claimed to have worked, and was paid for, an overnight shift from 4:00 p.m. on June 26, 2018 to 7:00 a.m. on June 27 at the West Side Yard in

Manhattan.  In fact, however, I believe BALESTRA did not work the entirety of this shift as claimed, because, among other reasons:

       i.     Based on BALESTRA's phone records, BALESTRA engaged in approximately 25 phone calls, starting at approximately 4:18 p.m. and continuing through at least 11:17 p.m. on June 26, 2018 (*i.e.*, over 7 hours after the start of BALESTRA's shift), from the vicinity of Blue Point, Holtsville, Patchogue, and two other locations in Suffolk County all over 40 miles away from the job site by car.

      ii.     Notwithstanding the above, subsequent to the shift BALESTRA submitted a labor sheet to the MTA, falsely self-reporting that he had worked the full shift, from 4:00 p.m. on June 26 to 7:00 a.m. on June 27.  As a result, for that shift alone, BALESTRA was paid approximately $1,322.

*August 15-16, 2018*

     c.     According to MTA records, BALESTRA claimed to have worked, and was paid for, an overnight shift from 4:00 p.m. on August 15, 2018 to 6:00 a.m. on August 16 at the West Side Yard in Manhattan.  In fact, however, I believe BALESTRA did not work the entirety of this shift as claimed, because, among other reasons:

       i.     Based on BALESTRA's phone records, BALESTRA engaged in seven phone calls, starting at approximately 5:25 p.m. and continuing as late as 9:27 p.m. on August 15, 2018 (*i.e.*, during BALESTRA's shift) from the vicinity of Blue Point and Bayport, New York.  Bayport is a hamlet in the town of Islip in Suffolk County, near Blue Point, and over 59 miles away from the job site by car.

      ii.     Notwithstanding the above, subsequent to this shift BALESTRA submitted a labor sheet to the MTA, falsely self-reporting that he had worked the full shift, from 4:00 p.m. on August 15 to 6:00 a.m. on August 17.  As a result, for that shift alone, BALESTRA was paid approximately $1,032.

     WHEREFORE, I respectfully request that arrest warrants be issued for THOMAS CAPUTO, JOSEPH RUZZO, JOHN NUGENT, and JOSEPH BALESTRA, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.


                    /s/ Matthew Brigham
                _____
                MATTHEW BRIGHAM
                Special Agent, FBI

Sworn to before me this
30th day of November, 2020

_____Katharine H. Parker_____
THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK